**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| HOYOS INTEGRITY CORPORATION, | Case No. 22-10365 (MFW) |
| Debtor.[1] | |
| | **Hearing Date: May 24, 2022, at 2:00 p.m. (ET)**<br>**Obj. Deadline: May 17, 2022, at 4:00 p.m. (ET)** |

## MOTION OF GREEN HILLS SOFTWARE LLC
## FOR RELIEF FROM THE AUTOMATIC STAY

Green Hills Software LLC ("Green Hills"), by and through its undersigned counsel, respectfully moves this Court (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to section 362(d) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) granting relief from the automatic stay to allow Green Hills to (a) terminate its license agreement with Hoyos Integrity Corporation, debtor and debtor-in-possession in the above captioned chapter 11 case (the "Debtor"); and (b) exercise its rights and remedies with respect to the collateral securing its claims against the Debtor; and (ii) waiving the 14-day stay provided for in Bankruptcy Rule 4001(a)(3).  In support of this Motion, Green Hills respectfully states as follows:

---

[1]  The last four digits of the Debtor's employer identification number are 5267.  The Debtor's address is 1975 E. Sunrise Boulevard, Fort Lauderdale, Florida 33304.

## PRELIMINARY STATEMENT[2]

1.      The Debtor is a failed start-up that endeavored to design, manufacture, and ultimately sell ultra-secure mobile phones intended to protect against the risk of being compromised or hacked by well-funded sophisticated hackers and attackers.  The operating system that makes the Debtor's phones secure is Green Hills' proprietary "INTEGRITY" software, which is licensed to the Debtor pursuant to a non-exclusive trademark and copyright license.  Green Hills is not only a licensor of intellectual property to the Debtor but is also the only secured creditor in this case.  In 2020 and 2022, Green Hills loaned to the Debtor an aggregate principal amount of more than $4.1 million, secured by approximately 10,000 mobile phones (which phones were purchased with Green Hills' loan).  The Debtor is in default under the License Agreement and the Loan Agreement, and commenced this chapter 11 case with no active operations or viable restructuring plan, intending to stall Green Hills' efforts to foreclose on its Collateral (defined below) through a public auction that was scheduled for the day immediately following the Petition Date.

2.      By this Motion, Green Hills requests that the Court grant relief from the automatic stay to stem further prejudice and hardship to Green Hills, particularly since the result is inevitable: (i) the License Agreement cannot be assumed or assigned without Green Hills' consent, which Green Hills will not provide, and (ii) the Debtor has no equity in the Collateral and does not need (and cannot use) it to reorganize.

3.      *First*, under the Third Circuit's binding decision in *In re West Electronics Inc.*, 852 F.2d 79 (3d Cir. 1988), the Debtor is not able to assume or assign the License Agreement under Bankruptcy Code section 365(c)(1) without Green Hills' express consent.  Because of the Debtor's

---

[2]  Capitalized terms used but not defined in the Preliminary Statement are defined later in the Motion.

inability to *ever* sell the mobile phones contemplated under the License Agreement, its current lack of operating capacity, and its multiple breaches of the License Agreement (described below), Green Hills does not consent to Debtor's assumption or assignment of the License Agreement. Under *West Electronics* and multiple decisions from this District, the Debtor's inability to assume or assign the License Agreement is "cause" to grant relief from the automatic stay so that Green Hills can take the necessary steps to terminate the License Agreement.

4.      *Second*, the Court should grant Green Hills relief from the automatic stay so that it can resume and exercise its UCC remedies and foreclose on its Collateral.  As explained below, the 10,000 phones that serve as Green Hills' principal Collateral have no real value to the Debtor or the estate without the benefit of licenses to use Green Hills' protected intellectual property. Based on the current record, the value of these phones is significantly less than Green Hills' approximately $4.7 million secured claim, after accounting for prepetition interest and expenses. As explained below, all three factors that courts in this District analyze in determining whether there is "cause" to grant relief from stay are satisfied here.  Similarly, the Debtor does not have "equity" in Green Hills' Collateral, and such phones are not necessary to an effective reorganization.  Accordingly, the Court should grant relief from the automatic stay to permit Green Hills to complete the exercise of its default remedies with respect to its Collateral, thereby resolving the only secured claim on the Debtor's balance sheet.

5.      For the reasons set forth herein, and as will be proven at the hearing on the Motion, the Court should grant relief from the automatic stay to allow Green Hills to (i) terminate the License Agreement; and (ii) exercise its rights and remedies with respect to its Collateral.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for

the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), Green Hills consents to the entry of a final order by the Court in connection with this Motion[3] to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory and legal predicates for the relief requested herein are Bankruptcy Code section 362(d), Bankruptcy Rule 4001(a), and Local Rule 4001-1.

## BACKGROUND

### A.      Green Hills' Intellectual Property and License Agreement with the Debtor

9.      Founded in 1982, Green Hills is the largest independent company in the world providing Real Time Operating System ("RTOS") solutions and is a worldwide leader in embedded safety and security for connected operating systems.  The foundation of Green Hills' business and long-term success is its ability to provide ultra-secure RTOS solutions, to protect against and prevent system failures or external attacks for Green Hills' customers, caused either by internal bugs embedded in a company's software during the development stages, or by external threats such as hackers and viruses.  In its simplest terms, Green Hills' technology and software is licensed to third parties (such as the Debtor) to protect against the risk of a customer's software or operations being compromised by hackers, viruses, or embedded software bugs.  Green Hills' RTOS solutions provide secure and high-reliability applications for the military/avionics, medical, industrial, automotive, networking, consumer, and other markets that demand industry-certified solutions that provide the highest level of safety and security.  Green Hills' software and

---

[3]  Green Hills does not consent to jurisdiction of this Court to enter a final order for any purpose other than the resolution of this Motion.

technology is used for everything from inkjet printers to supersonic fighter jets—including automotive electronics, avionic systems, communications equipment, computer peripherals, consumer electronics, defense electronics, industrial control systems, medical devices, and space systems. Green Hills' customers include Lockheed Martin, the United States government, Toyota Motor Corporation, Northrop Grumman, Stryker, NASA, Ford, Hewlett Packard, and Raytheon.

10.    Green Hills' ability to provide the highest level of safe and secure RTOS solutions stems from its INTEGRITY Real Time Operating System ("<u>INTEGRITY RTOS</u>") and the INTEGRITY Operating System ("<u>INTEGRITY OS</u>," and together with INTEGRITY RTOS, "<u>INTEGRITY</u>"). The INTEGRITY RTOS was initially developed for, and deployed on, Boeing's B-1B intercontinental nuclear bomber. The INTEGRITY OS, which is based on the INTEGRITY RTOS, is designed to maintain security for multiple levels of classified and unclassified information on networks and computer systems. INTEGRITY RTOS has been evaluated by the National Security Agency (NSA) and certified by National Information Assurance Partners (NIAP) as having the highest rating among other operating systems for the protection of classified information against well-funded sophisticated hackers and attackers. In addition to its intellectual property rights in INTEGRITY, Green Hills also owns a number of proprietary "Marks," including trademarks, service marks, trade names, and logotypes associated with INTEGRITY.

11.    In 2016, the Debtor's predecessor[4] contacted Green Hills to assist in developing an ultra-secure mobile phone that could be used throughout the world by government officials and other individuals interested in absolutely protected communications, free from the security threats

---

[4]   The License Agreement was originally executed by Hoyos VSN Corporation ("<u>HVSN</u>"). HVSN transferred and assigned the License Agreement to the Debtor pursuant to Amendment Three to the Exclusive Licensing Agreement, dated as of October 31, 2018 (the "<u>Third License Amendment</u>"). A true and correct copy of the Third License Amendment is attached as **<u>Exhibit 4</u>** to the *Declaration of Jeffrey Hazarian in Support of the Motion of Green Hills Software LLC for Relief From the Automatic Stay* (the "<u>Hazarian Decl.</u>"), filed concurrently herewith.

posed by sophisticated hackers and attackers (whether governmental or extra-governmental). Green Hills' software and technology, and specifically INTEGRITY, was to be used and implemented into the Debtor's mobile phones to provide the ultra-secure technology necessary for their intended use.

12.    On December 15, 2016, the Debtor and Green Hills entered into that Exclusive Licensing Agreement (as amended or modified from time to time, the "License Agreement").[5] The License Agreement governs the relative rights and obligations of the Debtor, as licensee, and Green Hills, as licensor, in connection with the development of certain secure mobile phones and tablets (the "Implemented Licensee Products") by the Debtor using Green Hills' proprietary intellectual property, including INTEGRITY (the "Licensed Software").

13.    Under the License Agreement, Green Hills initially granted the Debtor an exclusive license with respect to the Licensed Software for use on certain secured mobile phones and tablets (the "Exclusive License").[6]  The Exclusive License was originally to expire 30 months from the Debtor's payment of the first installment on a $10 million "Initial Exclusivity Fee" agreed to by the Debtor, subject to three 1-year "Follow-on Exclusivity Periods," which could be exercised by the Debtor by paying an agreed fee prior to expiration of the previous term.  License Agreement §§ 1.6, 1.11, 5.2.  As a result, absent exercise of the Follow-on Exclusivity Periods, the Exclusive License was originally agreed to expire no later than September 15, 2019.  *Id.*[7]  However, the

---

[5]  A true and correct copy of the License Agreement is attached as **Exhibit 1** to the Hazarian Decl.

[6]  There are differences in the intellectual property covered by the Exclusive License and the Non-exclusive License (described herein) that are not material to the relief requested in this Motion, and that are not addressed in this Motion for purposes of clarity.  Green Hills reserves all rights under the License Agreement, and the License Agreement controls in the event of any inconsistencies with this Motion.

[7]  The "1st Installment" of the Initial Exclusivity Fee was required to be paid within three months of the Effective Date (December 15, 2016) of the License Agreement.  License Agreement § 5.1.  Assuming the Debtor paid the 1st Installment on the last possible day, then the "Initial Exclusivity Period" would expire 30 months thereafter, on September 15, 2019.

Debtor failed to timely make the installment payments on the Initial Exclusivity Fee. Rather than terminate the License Agreement due to the Debtor's failure to make timely payments required under the License Agreement, Green Hills, pursuant to the Third License Amendment, (i) extended the Debtor's deadline to pay the full amount of the Initial Exclusivity Fee by nine months to March 15, 2018, (ii) agreed that the "Exclusivity Period" would run from the last installment on the Initial Exclusivity Fee (rather than the first installment), and (iii) granted an additional two 1-year Follow-on Exclusivity Periods. This Third License Amendment extended the Debtor's Exclusivity Period by almost two years and extended the term of the License Agreement by almost four years, notwithstanding the Debtor's breaches of its payment terms. The Debtor never exercised any Follow-on Exclusivity Periods. As a result, the Debtor's Exclusive License expired by its terms on July 11, 2021.

14.    In addition to the Exclusive License, the License Agreement grants a non-exclusive license in favor of the Debtor to use the Licensed Software solely for purposes of developing the Implemented Licensee Products for the duration of the License Agreement (the "Non-exclusive License"). *See id.* § 3.5. Specifically, the License Agreement provides the Debtor with a non-exclusive license:

> (i) . . . only to develop Implemented Licensee Products; (ii) . . . to use, reproduce, modify and prepare derivative works of the Licensed Source and Licensed Object Code solely for the development and support of the Implemented Licensee Products; (iii) to incorporate and integrate Licensed Object Code into Licensee Products to develop, make and use Implemented Licensee Products at Licensee Sites, and to market, distribute, sell, and offer for sale, such Implemented Licensee Products solely within the Secured Mobile Phones and Tablets Market worldwide, and (iv) to license Licensed Object Code . . . for end use (not development) only as linked and incorporated Implemented Licensee Products solely within the Secured Mobile Phones and Tablets Market worldwide.

*Id.*

15.     The License Agreement "expire[s] at the end of the fifth (5th) and last Follow-on Exclusivity Period, unless earlier terminated pursuant to" Section 6 of the agreement.  *Id.* § 6.1. The last Follow-on Exclusivity Period, if exercised, would expire on July 11, 2026.  As a result, the term of the License Agreement expires no later than July 11, 2026.  The Non-exclusive License terminates with the expiration of the term of the License Agreement.  *Id.* § 5.3 ("In the event . . . Licensee opts not to renew its Exclusive License set forth in Section 3.1 at the end of the Initial Exclusivity Period or a Follow-on Exclusivity Period . . . , then Licensee's Non-exclusive License under Section 3.5 shall continue until the earlier of a termination or expiration of the Agreement."). As a result, even absent the Debtor's breaches of the License Agreement described below, *see infra* Background Section C, the Debtor will lose any right or license to Green Hills' Licensed Software by July 11, 2026, at the latest.

16.     The License Agreement also contains restrictions on the transfer of the Licensed Software, as well as the License Agreement itself.  License Agreement §§ 3.6, 14.12.  With respect to the Licensed Software, the License Agreement provides that the Debtor "acknowledges and agrees that it may not lend, sell, assign, sub-license, lease, hypothecate, or otherwise transfer, or permit others to use or execute Licensed Software, or any part thereof, or any derivative work, modification or improvement of Licensed Software[.]"  *Id.* § 3.6.  With respect to the License Agreement itself, the License Agreement does not permit the Debtor to assign the License Agreement to a third party unless (a) the Debtor obtains Green Hills' prior written consent or (b) there is no existing breach under the License Agreement and the third party assignee acquires substantially all of the Debtor's assets or merges with the Debtor.  *See id.* § 14.12.

17.     On information and belief, the Debtor currently has no business operations and no employees other than its Chief Financial Officer and General Counsel.  As a result, the Debtor does not appear to be utilizing its rights under the License Agreement.

**B.     The Loan Agreement and Green Hills' Pre-Petition Secured Claim**

18.     Since inception, the Debtor has been entirely unable to market any phones for sale to customers successfully.  As a result, the Debtor has never been able to generate revenue to support its operations.  At the same time, the Debtor was not able to generate cash through additional investments by its existing or potential equity-holders.  Accordingly, toward the end of 2020, the Debtor approached Green Hills to discuss potential solutions to the Debtor's severe liquidity issues.  To prevent the Debtor's liquidation, Green Hills ultimately agreed to loan the Debtor $4 million with the goal of providing sufficient funding to progress its business to a point where it could begin generating revenue from phone sales.

19.     On December 15, 2020, the Debtor, as borrower, and Green Hills, as lender, entered into that certain Loan and Security Agreement (as amended or modified from time to time, the "Loan Agreement"),[8] pursuant to which Green Hills agreed to make a loan in the original principal amount of $4 million to the Debtor (the "Initial Loan").  *See* Loan Agreement § 2.1(a).  The proceeds of this loan were intended to be used to fund (i) the Debtor's acquisition of 10,000 phones from its phone manufacturer and supplier, Tinno Mobile Technology Corp., (ii) the completion of the infrastructure setup for 5G service for the Debtor's phones (which never occurred), and (iii) other operational support needs of the Debtor, including paying employee wages and making lease payments to the Debtor's landlords. *See id.* § 6.7.

---

[8]  A true and correct copy of the Loan Agreement is attached to the Hazarian Decl. as **Exhibit 10**.

20.    The obligations under the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement) are secured by a first priority lien on the following assets of the Debtor:

- the first 10,000 phones acquired and/or manufactured by the Debtor following the date of the Loan Agreement (*i.e.*, December 15, 2020), including any phones acquired by the Debtor using the loan proceeds, and any intellectual property embedded in such phones;

- all of the Debtor's books and records with respect to such phones, and the computers and equipment containing said books and records;

- any and all cash and/or noncash proceeds of any of the foregoing, including, without limitation, (i) insurance proceeds, (ii) all supporting obligations and the security therefor or for any right to payment, and (iii) any documentation evidencing any sale, lease, or other disposition of any of the phones that are part of Green Hills' collateral package (collectively, the "Collateral").

*See id.* §§ 1.1 (def.), 4.1; *id.*, Exhibit A (Collateral Description) (the phones described in the definition of "Collateral" are referred to herein as the "Phones"). The Debtor and Green Hills also entered into that certain Collateral Access Agreement dated as of December 31, 2020 (the "Collateral Access Agreement")[9] with National Circuit Assembly Corp. ("NCA"), the lessor for the facility that housed the approximately 10,000 Phones acquired and/or manufactured by the Debtor that secure the obligations under the Loan Agreement.

21.    The "Maturity Date" under the Loan Agreement was December 15, 2021 (the "Initial Loan Maturity Date"). The Debtor did not repay the outstanding amount of the Initial Loan on the Initial Loan Maturity Date, triggering an "Event of Default" under the Loan Agreement and causing all obligations under the Loan Agreement to accelerate. *Id.* § 8.1. The loan accrues default interest at the rate of 10% per annum.[10] *Id.* § 2.2(b).

---

[9]    A true and correct copy of the Collateral Access Agreement is attached to the Hazarian Decl. as **Exhibit 11**.

[10]    The $4 million loan under the Loan Agreement did not accrue non-default interest.

22.     Notwithstanding that the Loan Agreement was then in default, in January 2022, the Debtor again approached Green Hills to help with the Debtor's increasingly severe liquidity problems.  Green Hills, again reflecting its support for the Debtor, loaned the Debtor an additional $105,217 (the "Amendment One Loan") for the express purpose of paying the Debtor's office rent and to pay premiums due under the Debtor's Directors & Officers insurance policy.  The Amendment One Loan is governed by that certain Amendment One to the Loan and Security Agreement (the "Loan Agreement Amendment").[11]  The Amendment One Loan was loaned pursuant to the Loan Agreement Amendment, is also secured by the Collateral, accrues interest at 10% per annum, and included a maturity date of December 15, 2022.[12]

23.     After execution of the Loan Agreement Amendment, Green Hills endeavored to reach a mutual resolution of the Debtor's defaults under the Loan Agreement and License Agreement that would, among other things, allow the Debtor to avoid bankruptcy and permit it to remove Green Hills' secured loan from its balance sheet.  These discussions were ultimately unsuccessful.

24.     As a result, on March 10, 2022, Green Hills delivered to the Debtor a "Notice of Default and Reservation of Rights" (the "Notice of Default")[13] related to the ongoing Initial Loan Maturity Date default, as well as certain covenant and other defaults that ripened into Events of Default (collectively, and together with the Initial Loan Maturity Date default, the "Specified Defaults").  On the same day, pursuant to Section 4 of the Collateral Access Agreement, Green Hills also delivered to NCA a "Notice of Control re Hoyos Integrity Corporation Property" (the

---

[11]  A true and correct copy of the Loan Agreement Amendment is attached to the Hazarian Decl. as **Exhibit 12**.

[12]  The Loan Agreement Amendment specifically acknowledged and did not waive the Debtor's Event of Default under the Loan Agreement for failing to pay the $4 million Initial Loan by the Initial Loan Maturity Date and did not extend the Initial Loan Maturity Date as to the Initial Loan.

[13]  A true and correct copy of the Notice of Default is attached to the Hazarian Decl. as **Exhibit 13**.

"Notice of Control"),[14] notifying NCA of the Specified Defaults.  Consistent with the Collateral

Access Agreement, Green Hills peacefully took possession of the Phones, which are currently

housed in a secure warehouse in Texas.  Subsequent to the delivery of the Notice of Default and

Notice of Control, and through the commencement of this case, Green Hills continued to try to

negotiate a consensual resolution with the Debtor.

25.    On March 23, 2022, pursuant to section 9-611 of the Uniform Commercial Code

(the "UCC") and Section 9 of the Loan Agreement, Green Hills delivered to the Debtor a "Notice

of Disposition of Collateral Pursuant to the Uniform Commercial Code of the State of New York"

(the "Notice of Disposition"), notifying the Debtor of its intent to hold a public sale of the

Collateral on April 22, 2022, and subsequently commenced a public marketing and auction

process.  In connection with the marketing of the Collateral for auction, Green Hills published

information describing the auction and Collateral (i) continuously starting March 25, 2022, with

the online sale platform DailyDAC ("Distressed Asset Central"), and in Distressed Asset Central's

weekly newsletter between March 29 and April 19, 2022; (ii) weekly between March 31 and April

18, 2022, in the Broward Daily Business Review (which covers the Debtor's principal place of

business); (iii) weekly between March 25 and April 19, 2022, in The Galveston County Daily

News (which covers the area in which the Collateral is located); (iv) weekly between April 9 and

April 19, 2022, in the San Jose Mercury News (which covers Silicon Valley); and (v) continuously

between April 13 and April 22, 2022, with the online trade publication Mobile Marketing

Magazine.  Green Hills received several in-bound inquiries in response to its marketing initiatives,

but no potential purchasers ultimately submitted a bid in advance of the scheduled auction.

---

[14]   A true and correct copy of the Notice of Control is attached to the Hazarian Decl. as **Exhibit 14**.

26.     The auction, scheduled for April 22, 2022, was stayed and did not proceed due to the Debtor's filing of its voluntary petition for relief with this Court.

### C.     The Debtor's Multiple Breaches of the License Agreement

27.     Prior to the commencement of this chapter 11 case, the Debtor committed multiple uncured, material breaches of the License Agreement.  These breaches include the following.

28.     *First*, the Debtor breached Section 3.17 of the License Agreement.  As a condition to Green Hills lending $4 million to the Debtor, Green Hills and the Debtor agreed to that certain Amendment Eight to the Exclusive Licensing Agreement, dated as of December 15, 2020 (the "Eighth License Amendment").[15]  Pursuant to the Eighth License Amendment, the Debtor agreed to "make the human readable source code version of the software included in [its own intellectual property used in the Phones (the 'Licensee IP')], . . . available to [Green Hills] on an as-developed, daily basis."  Eighth License Amendment § 4 (creating a new License Agreement § 3.17).  The Eighth License Amendment further granted Green Hills, upon the occurrence of an Event of Default under the Loan Agreement, a non-exclusive license for the Licensee IP, "solely in connection with the Collateral, including the sale, manufacturing, exploitation and other disposition of the Collateral."  *Id.* § 3 (creating a new License Agreement § 3.16).  The purpose behind the Eighth License Amendment was to provide Green Hills access to, and rights in, the intellectual property necessary to promptly sell and maximize the value of the Phones upon the occurrence of an Event of Default.  Notwithstanding Green Hills' many requests, the Debtor never provided Green Hills access to the Licensee IP, thereby breaching Section 3.17 of the License Agreement.

---

[15]  A true and correct copy of the Eighth License Amendment is attached to the Hazarian Decl. as **Exhibit 9**.  Prior to the Petition Date, certain members of the Debtor's board of directors asserted that the Eighth License Amendment was not authorized.  Green Hills has direct evidence belying this contention, which will be presented to this Court if the Debtor continues to advance this frivolous argument.

29.     *Second*, the Debtor's ongoing use of the INTEGRITY trademark after July 11, 2021, breached Section 3.11 of the License Agreement.  Under the License Agreement, Green Hills granted the Debtor a non-exclusive license for the "Initial Exclusivity Period" to use Green Hills' registered trademark, "INTEGRITY," in its business name—Hoyos Integrity Corporation. *Id.* § 3.11.[16]   The "Initial Exclusivity Period," along with the license to use the INTEGRITY trademark in the Debtor's corporate name, expired on July 11, 2021.  Accordingly, the Debtor's ongoing use of the INTEGRITY trademark in its corporate name is a breach of the License Agreement.

30.     *Third*, recent public communications suggest that the Debtor may be in breach of Section 2 of the License Agreement by its knowing and continuing use of Green Hills' trademark outside the scope of its license, thereby diluting Green Hills' federally registered trademark.  Green Hills' non-exclusive license to use the INTEGRITY trademark in the Debtor's corporate name also precluded the Debtor, while using the INTEGRITY trademark, from, among other things, making, marketing, or selling any products or services other than the manufacture and sale of the mobile phones incorporating the INTEGRITY OS as contemplated under the License Agreement. Second License Amendment § 2 (amending License Agreement § 3.11).  The purpose behind this provision was to prevent (i) the impairment of the distinctiveness of the trademark by association with a similar mark and (ii) dilution of the mark caused by third parties being confused into thinking that products that do not include or meet the standard of the INTEGRITY software are

---

[16]   The final version of Section 3.11 is reflected in Amendment Seven to the Exclusive Licensing Agreement, dated as of October 20, 2020 (the "Seventh License Amendment").  This section was previously amended pursuant to that Amendment Two to the Exclusive Licensing Agreement, dated as of December 1, 2017 (the "Second Licensing Amendment"), and by the Third Licensing Amendment.  Green Hills licensed the INTEGRITY trademark for use in the Debtor's name *after* the Debtor changed its name to include "Integrity," and similarly registered its own confusingly similar trademarks with the word "Integrity," all without Green Hills' permission. As part of the Third Licensing Agreement, Debtor agreed to assign or deregister and abandon nine trademarks it used and/or registered that included the word "INTEGRITY."

nonetheless associated with Green Hills or INTEGRITY due to the Debtor's corporate name. Such confusion would weaken and tarnish Green Hills' trademark, eroding its value and the good will therein. On information and belief, the Debtor may be violating this prohibition by manufacturing, marketing, and potentially selling a secure mobile wallet for crypto currency, wholly unrelated to the mobile phones or the INTEGRITY OS/INTEGRITY RTOS and using the INTEGRITY mark in the Debtor's corporate name to market that product. Based on a November 30, 2021 press release issued by HDI Global SE ("HDI"),[17] an industrial lines insurer based in Germany, the Debtor is marketing itself as specializing in the "secure storage, custody and transfer of digital assets" and providing and/or selling services that do not involve mobile phones or include the INTEGRITY software. This is precisely the type of service or product that the Debtor agreed it would not offer while using the INTEGRITY trademark in its corporate name. Ongoing violation of the INTEGRITY trademark risks damaging the Green Hills brand by confusing existing or potential customers that are receiving products or services inferior to the highest-level secure technology offered by Green Hills.

31.     *Fourth*, the Debtor's ongoing violation of the INTEGRITY trademark, discussed above, is a breach of the "Compliance with Law" provision in Section 3.7 of the License Agreement. Section 3.7 requires the Debtor, in relevant part, to "comply with all applicable laws, regulations, rulings, and executive orders of the United States and any other applicable jurisdictions . . . ." Unauthorized use of a trademark is a violation of the Lanham Act when such use is "likely to create confusion concerning the origin of the goods or services." *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 803–04 (3d Cir. 1998) (quoting *S&R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 374 (3d Cir. 1992)). A "[l]ikelihood of confusion exists when

---

[17]   A true and correct copy of this press release is attached to the Hazarian Decl. at **Exhibit 21**.

Case 22-10365-MFW    Doc 20    Filed 05/10/22    Page 16 of 32

consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Id.* (quoting *First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.*, 923 F. Supp. 693, 703–04 (E.D. Pa. 1996)). "[W]here the identical mark is used concurrently by unrelated entities," as is the case with the Debtor's use of the INTEGRITY mark, "the likelihood of confusion is inevitable." *See id.* (citation omitted). By continuing to use the INTEGRITY mark in its corporate name, the Debtor is creating an inevitable likelihood of confusion in violation of the Lanham Act and, therefore, in violation of Section 3.7 of the License Agreement.

32.     If the Court grants the relief requested herein, Green Hills intends to exercise its contractual and legal rights to terminate the License Agreement.

**D.     The Debtor's Bankruptcy Filing**

33.     On April 21, 2022 (the "Petition Date"), on the eve of Green Hills' noticed UCC auction and without warning, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, initiating this bankruptcy case for the sole purpose of staying the UCC sale. The Debtor has no apparent reorganization plan, no active operations, and has no apparent cash or commitment to fund even the administrative costs of a chapter 11 case. As of the Petition Date, the aggregate principal amount outstanding under the Loan Agreement, together with the amount of accrued and unpaid interest and expenses as of the Petition Date, is not less than approximately $4,721,778.84, which amounts will continue to accrue and/or increase during the Debtor's bankruptcy.

**RELIEF REQUESTED**

34.     By this Motion, Green Hills respectfully requests that this Court enter the Proposed Order (i) granting relief from the automatic stay to allow Green Hills to (a) terminate the License Agreement; and (b) exercise its rights and remedies with respect to the Collateral securing its

16

claims against the Debtor; and (ii) waiving the 14-day stay provided for in Bankruptcy Rule 4001(a)(3).

## **BASIS FOR RELIEF**

35.     Section 362(d) of the Bankruptcy Code provides, in relevant part, as follows:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; [or]
> >
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> >
> > > (A) the debtor does not have an equity in such property; and
> > >
> > > (B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d)(1)–(2).

36.     Except for lack of adequate protection, "cause" is not defined in section 362(d)(1). This Court has held that "[c]ause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay."  *In re Abeinsa Holding, Inc.*, 2016 WL 5867039, at *2 (Bankr. D. Del. Oct. 6, 2016) (citing *In re SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007)); *see also Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997); *Am. Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 152 B.R. 420, 424 (D. Del. 1993).  In considering the totality of the circumstances, the Court "is accorded considerable discretion in evaluating the competing interests." *In re Bell*, 476 B.R. 168, 179 (Bankr. E.D. Pa. 2012) ("[I]n some cases, . . . the equities of freeing the creditor from the restraint of the automatic stay may

outweigh the potential negative impact that such relief would have on the bankruptcy process.").
*Id.*

37.     Courts in this District apply a three-factor balancing test to determine whether cause exists to lift the automatic stay, which examines whether:  (i) any great prejudice to either the bankrupt estate or the debtor will result from lifting the stay; (ii) the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and (iii) the creditor has a probability of prevailing on the merits.  *Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992); *see also In re Gulph Woods Corp.*, 84 B.R. 961, 972 (Bankr. E.D. Pa. 1988) (evaluating whether a secured lender received "adequate protection" from a debtor requires "a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, [and] the prospects for successful reorganization of the Debtor's affairs").  Cause may be established by a single factor, however, that weighs in favor of lifting the stay.  *In re Rexene*, 141 B.R. at 576.

38.     "The movant bears the initial burden to produce evidence that cause exists to grant relief from the automatic stay; if the movant meets its burden, then the burden shifts to [the] opposing party."  *In re DBSI, Inc.*, 407 B.R. 159, 166 (Bankr. D. Del. 2009) (citing *In re Rexene*, 141 B.R. at 577).

39.     All factors weigh heavily in favor of lifting the automatic stay to allow Green Hills to (i) terminate the License Agreement; and (ii) exercise its rights and remedies with respect to the Collateral securing its claims against the Debtor.  Additionally, the Court should lift the stay with respect to the Collateral because the Debtor "does not have an equity in" Green Hills' Collateral, and the Collateral "is not necessary to an effective reorganization."  *See* 11 U.S.C. § 362(d)(2).

29347263.1

A. **"Cause" Exists to Grant Green Hills Relief from Stay to Terminate the License Agreement.**

40. The Third Circuit has recognized that a contract counterparty should be granted relief from the automatic stay to terminate its contract with a chapter 11 debtor where the contract cannot be assumed or assigned under Bankruptcy Code section 365(c)(1). *In re West Elecs. Inc.*, 852 F.2d at 82–83. Courts in this District have recognized this principle in granting relief from stay so that a licensor of intellectual property can terminate its license agreement with the debtor, when the subject license cannot be assumed or assigned without the licensor's consent. *In re Trump Entm't Resorts, Inc.*, 526 B.R. 116, 125 (Bankr. D. Del. 2015); *In re Rupari Holding Corp.*, 573 B.R. 111, 120 (Bankr. D. Del. 2017).

41. The Third Circuit, in *West Electronics*, adopted the "hypothetical" test in determining whether a trustee or debtor in possession can assume an executory contract when "applicable law" prevents assignment without the counterparty's consent. *In re West Elecs. Inc.*, 852 F.2d at 82–83; *see also In re Trump Entm't Resorts, Inc.*, 526 B.R. at 122 ("The Third Circuit has adopted the Hypothetical Test."). Accordingly, under section 365(c)(1) and *West Electronics*, a chapter 11 debtor may neither assume nor assign an executory contract if (i) "applicable law" excuses the other party to the contract from accepting performance from an entity other than the debtor, and (ii) the other party does not consent to the assumption or assignment. 11 U.S.C. § 365(c)(1)(A). This rule applies regardless of whether the debtor actually intends to assign (rather than assume) the executory contract. *In re West Elecs. Inc.*, 852 F.2d at 82–84; *see also In re Trump Entm't Resorts, Inc.*, 526 B.R. at 122 ("Section 365(c)(1) limits a debtor in possession's ability to *assume* an executory contract based on its ability to *assign* that executory contract to a third party and makes no reference to whether a debtor or debtor in possession actually intends to assign the executory contract to a third party.").

i.     **The License Agreement Is an Executory Contract that Under "Applicable Law" Cannot Be Assigned Without Green Hills' Express Consent.**

42.     The License Agreement provides for a non-exclusive license of Green Hills' trademarks and copyrighted material in favor of the Debtor.  It is well settled in this District that copyright and trademark licenses in favor of a chapter 11 debtor constitute executory contracts under Bankruptcy Code section 365.  *E.g.*, *In re Valley Media, Inc.*, 279 B.R. 105, 135 (Bankr. D. Del. 2002) ("The Third Circuit follows the general rule that intellectual property licenses, including copyright licenses, are executory contracts within the meaning of 11 U.S.C. § 365(c) under the Countryman Test.") (citing *In re Golden Books Fam. Ent., Inc.*, 269 B.R. 300, 308 (Bankr. D. Del. 2001); *In re Access Beyond Tech., Inc.*, 237 B.R. 32, 43 (Bankr. D. Del. 1999)); *In re Trump Entm't Resorts, Inc.*, 526 B.R. at 121 (holding that a trademark license is an executory contract).[18]

43.     Further, it is well settled that "applicable law" excuses Green Hills from accepting performance under the License Agreement from a party other than the Debtor.  *E.g.*, *In re Valley Media, Inc.*, 279 B.R. at 136 ("Since non-exclusive licenses may not be assigned by the licensee under applicable copyright law, they may not be assumed by the debtor in possession.") (citing *In re Golden Books*, 269 B.R. at 308–09); *In re Trump Entm't Resorts, Inc.*, 526 B.R. at 123 ("[T]he substantial weight of authority holds that under federal trademark law, trademark licenses are not assignable in the absence of some express authorization from the licensor, such as a clause in the license agreement itself.").  Restrictions on assignment of trademark or copyright licenses are established for good reason.  "[F]ederal trademark law generally bans assignment of trademark

---

[18]  "Applying the Countryman definition of executory contracts, courts generally have found intellectual property licenses to be 'executory' within the meaning of section 365(c) because each party to the license had the material duty of 'refraining from suing the other for infringement of any of the [intellectual property] covered by the license.'"  *In re Golden Books*, 269 B.R. at 308 (quoting *In re Access Beyond Tech., Inc.*, 237 B.R. at 32).

licenses absent the licensor's consent, in order to ensure that all products bearing its trademark [are] of uniform quality[;] the identity of the licensee is crucially important to the licensor." *In re Rupari Holdings Corp.*, 573 B.R. at 117 (citing *In re Trump Entm't Resorts, Inc.*, 526 B.R. at 124).

44.     As a result, absent the "express" consent of Green Hills, the Debtor cannot assume or assign the License Agreement, and the Court should grant relief from the automatic stay so that Green Hills can take the necessary steps to terminate the License Agreement. *See In re Trump Entm't Resorts, Inc.*, 526 B.R. at 125; *In re Rupari Holding Corp.*, 573 B.R. at 120.

> ii.     **The License Agreement Does Not Authorize Assumption or Assignment.**

45.     Courts have recognized one exception to the general prohibition on assignment of copyright and trademark licenses: the "express" or "explicit" consent of the licensor to the assignment of the applicable license. *E.g.*, *In re Trump Entm't Resorts, Inc.*, 526 B.R. at 123 ("[T]rademark assignments are not assignable in the absence of some ***express authorization*** from the licensor, such as a clause in the license agreement itself.") (emphasis added); *In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011) ("[T]he universal rule is that trademark licenses are not assignable in the absence of a clause ***expressly authorizing assignment***.") (emphasis added); *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984) ("[C]opyright licenses cannot be transferred without ***explicit authorization*** in the agreement.") (emphasis added).  For the avoidance of doubt, Green Hills does not consent to either the assumption or assignment of the License Agreement.

46.     Further, the License Agreement does not provide express authorization for the assignment of the License Agreement sufficient to overcome the general rule that copyright and trademark licenses are not assignable.  The licenses granted under the License Agreement are

generally described as non-transferrable.  *See* License Agreement §§ 3.1, 3.5, 3.6, 3.11.  The License Agreement includes the following provision governing assignment:

> <u>Assignment</u>.  ***Neither Party may assign this ELA or its rights or delegate its duties or obligations hereunder without the other Party's prior written consent***.  Any such assignment shall be considered null and void.  Notwithstanding the foregoing, either party, ***provided it is not then in breach of the Agreement***, may assign this Agreement to an entity which ***acquires substantially all of its assets or merges with it***.

License Agreement § 14.12 (emphasis added).

47.    Section 14.12 of the License Agreement, consistent with "applicable law" governing the assignment of trademark and copyright licenses, precludes assignment of the License Agreement without Green Hills' "prior written consent."  The provision's authorization to assign the License Agreement "to an entity which acquires substantially all of" the assigning party's assets does not apply here.

48.    *First*, if the Debtor is "then in breach of the Agreement," it may not assign the License Agreement even to a party that acquires substantially all of its assets.  As explained above, the Debtor has breached the License Agreement in multiple ways, which breaches are continuing and uncured.  *See supra* Background Section C.  The License Agreement must provide "express" or "explicit" authority for assignment to allow the Debtor to assume or assign such agreement under the Third Circuit's hypothetical test.  *See, e.g., In re Trump Entm't Resorts, Inc.*, 526 B.R. at 123; *Harris*, 734 F.2d at 1335.  Here, Green Hills has not provided any express or explicit authority because, in negotiating and drafting the License Agreement, it expressly and explicitly withheld its consent to assignment if the Debtor were "then in breach of the Agreement."  By its plain language, Section 14.12 of the License Agreement does not authorize assignment.  Further, to the extent the Debtor disputes its multiple breaches of the Agreement, then such dispute is subject to a binding arbitration provision in the License Agreement and should be resolved through

the agreed arbitration process.  License Agreement § 14.3; *e.g.*, *In re Mintze*, 434 F.3d 222, 229 (3d Cir. 2006) (bankruptcy courts must enforce valid arbitration agreements unless the party opposing arbitration can demonstrate "congressional intent to create an exception to the FAA's mandate with respect to the party's . . . claims").

49.     *Second*, the only circuit-level decision to address the issue found that language in a license agreement permitting "the transfer of [a] License to a successor in interest of substantially all of [the debtor's] assets" (the "<u>Transfer Provision</u>") is not sufficient to permit assumption of such license agreement under the hypothetical test.  *RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257, 270 (4th Cir. 2004).  In disregarding the Transfer Provision for purposes of determining whether the license agreement could be assumed by a chapter 11 debtor, the Fourth Circuit reasoned as follows:

> [The licensor] consented to [the debtor's] assignment of the License to a successor in interest under certain circumstances.  The Transfer Provision, however, does not apply to an *assumption* of the Agreement by a Chapter 11 debtor in possession. Because the terms assumption and assignment describe "two conceptually distinct events," and because the Transfer Provision pertains to an assignment rather than an assumption, [the licensor] did not consent to [the debtor's] assumption of the Agreement.  Without [the licensor's] consent, [the debtor] was precluded from assuming the Agreement.

*Id.* at 271 (quoting *In re Catapult Entm't, Inc.*, 165 F.3d 747, 752 (4th Cir. 2004)).

50.     This ruling in *Sunterra* is supported by Judge Gross's decision in *Trump Entertainment*.  In *Trump Entertainment*, the court analyzed whether a trademark licensor consented to the assignment of its license to the debtor (and therefore to assumption under Bankruptcy Code section 365(c)(1)), by providing advance consent to assignment of the license in the event a lender commenced an enforcement action against the debtor.  *In re Trump Entm't Resorts, Inc.*, 526 B.R. at 119–20.  The court found that such a consent was not sufficient to permit assignment of the subject license.  Judge Gross found that the applicable "Consent Agreement

deals with consent to assignment in the context of a state law enforcement action and not with consent to assumption and assignment under Section 365, *which is a technical process specific to bankruptcy*." *Id.* at 125 (emphasis added).  Even if the Debtor were not in breach of the License Agreement in the present matter, which it is, consent to assignment in the event of a sale of substantially all of the Debtor's assets is not the same as the "technical process" for assumption and assignment under section 365.

51.    For the reasons set forth herein, Green Hills has not consented to the assignment of the License Agreement.  Accordingly, under section 365(c)(1) and "applicable law," the Debtor cannot assume or assign the License Agreement.  Under *West Electronics*, this constitutes cause for granting relief from the automatic stay to permit Green Hills to terminate the License Agreement.  *In re West Elecs. Inc.*, 852 F.2d at 82–83; *see also In re Trump Entm't Resorts, Inc.*, 526 B.R. at 125; *In re Rupari Holding Corp.*, 573 B.R. at 120.

**B.    "Cause" Exists to Grant Green Hills Relief from Stay to Exercise Its Rights and Remedies with Respect to Its Collateral.**

52.    In addition to cause existing to permit Green Hills to terminate the License Agreement, all three of the "cause" factors weigh in favor of granting relief from stay to allow Green Hills to exercise its rights and remedies with respect to the Collateral securing its claims against the Debtor.  There is both a lack of "adequate protection" and a serious imbalance in the harm to be imposed upon Green Hills if the automatic stay were to remain in place with respect to the Collateral.

**i.    No Prejudice to the Debtor Will Result from Lifting the Automatic Stay.**

53.    Lifting the automatic stay to allow Green Hills to exercise its rights and remedies will not prejudice the Debtor or its estate for multiple reasons.

54. *First*, the Debtor currently has no employees and no operations, and has ***never*** been able to successfully sell its mobile phones. In order to monetize the Phones that are Green Hills' Collateral, or to otherwise continue as a viable business, the Debtor must be able to provide ongoing support and a back-end network that will allow the Phones to be used for mobile communications. The Debtor has no employees to even sell the Phones, much less manage a mobile network. The Debtor is not even paying the rent associated with the storage of the Phones; Green Hills is doing so for the benefit of the estate. Moreover, as explained above, the License Agreement cannot be assumed, and is terminable due to the Debtor's multiple uncured breaches of the agreement. Accordingly, based on the existing record, the Phones do not provide any value to the Debtor or the estate, and permitting Green Hills to foreclose on the Phones will not prejudice the Debtor or the estate.

55. *Second*, permitting Green Hills to foreclose on the Collateral will actually provide significant benefit to the estate. As discussed above, as of the Petition Date, the aggregate principal amount outstanding to Green Hills under the Loan Agreement, together with the amount of accrued and unpaid interest and expenses as of the Petition Date, is not less than approximately $4,721,778.84, which amounts will continue to accrue and/or increase during the Debtor's bankruptcy. If this Motion is granted, Green Hills intends to credit bid up to the entirety of its secured claim to purchase the Collateral at a foreclosure sale. Accordingly, by permitting Green Hills to foreclose on the Collateral, the estate will be freed of its only secured claim and left only with any potential unsecured deficiency claim.

56. Conversely, based on the current record, the Phones appear to be worth significantly less than the amount of Green Hills' secured claim. On information and belief, the Debtor paid approximately $3,250,000 in early 2021 for the Phones. Further, the Phones are not

ideal for sale or use for ordinary purposes. Among other things, they are only capable of providing 4G (rather than 5G) connectivity and do not have the brand power of an Apple or Samsung phone. Moreover, the Phones that constitute Green Hills' Collateral are limited in their geographic use. Only approximately 10% of the Phones are U.S.-band phones, with the remaining Phones being international-band only. As a result, the optimal use of the Phones is limited by geographic area, which negatively impacts the marketability and value of the Phones. This is evidenced in part by the fact that, notwithstanding its commercially reasonable efforts to market and sell the Phones at public auction prior to the Petition Date, Green Hills did not receive *any* bids for the Phones, much less a bid that would exceed the amount of Green Hills' secured claim.

> ii.     **The Hardship to Green Hills by Not Lifting the Stay Outweighs Any Hardship to the Debtor.**

57.     Green Hills would suffer substantial hardship if it is unable to exercise its rights and remedies with respect to its Collateral under the Loan Agreement. The hardship to Green Hills considerably outweighs any hardship to the Debtor because, absent the relief requested herein, Green Hills could be prevented from ever realizing the benefit of its bargain under the Loan Agreement. And as discussed above, the estate has no interest in the Collateral over and above Green Hills' remaining security interest in it.

58.     *First*, Green Hills' interest in the Collateral is not adequately protected because—as discussed above—the current record suggests that Green Hills is undersecured, and the value of the Phones that comprise the Collateral is depreciating every day as they become more obsolete compared to new technology and phones that continue to be developed. This is cause enough to justify lifting the automatic stay. *See* 11 U.S.C. § 362(d)(1).

59.     Moreover, Green Hills is entitled to the full benefit of its bargain under the Loan Agreement. *See, e.g., In re Dewey Commercial Investors, L.P.*, 503 B.R. 643, 654 (Bankr. E.D.

Pa. 2013) ("The Debtor may not use the automatic stay . . . to deprive the Movant of its bargained for interests."). It is a fundamental principle of bankruptcy law that a creditor's right to payment is determined by reference to non-bankruptcy law. *Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."). The Loan Agreement is governed by New York law. *See* Loan Agreement § 11. Under New York law, "written agreements are construed in accordance with the parties' intent and the best evidence of what parties to a written agreement intend is what they say in their writing." *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013) (citations omitted); *see also Slamow v. Delcol*, 594 N.E.2d 918, 919 (N.Y. 1992) (enforcing contract in accordance with its terms where "words used in the parties' contract are clear and unambiguous"). The Loan Agreement clearly and unambiguously provides that, if an Event of Default has occurred, Green Hills is entitled to exercise all of its rights and remedies under the Loan Agreement, including, but not limited to, the right to accelerate all obligations under the Loan Documents and demand immediate payment, the right to take possession of and sell or otherwise dispose of the Collateral, and the right to credit bid and purchase the Collateral at a public sale. *See* Loan Agreement § 9.1.

60.    The automatic stay—a procedural mechanism—does not affect the substance of a claim against the estate. *See, e.g., In re Rodriguez*, 629 F.3d 136, 142 (3d Cir. 2010) (automatic stay "does not determine a creditor's claim but merely suspends an action to collect the claim outside the procedural mechanisms of the Bankruptcy Code") (quoting *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 354 (5th Cir. 2008)). Nor does it extinguish any debt or limit a debtor's liability for a debt. To the contrary, section 502(b) of the Bankruptcy Code provides that a claim is allowed except to the extent the claim is "unenforceable against the debtor . . . under any agreement or applicable law for a reason other than because such claim is contingent." 11

U.S.C. § 502(b)(1).  Because Green Hills lacks adequate protection and is entitled to the benefit of

its bargain under the Loan Agreement, while the Debtor has no interest of value in the Collateral,

the hardship to Green Hills by not lifting the automatic stay far outweighs any hardship to the

Debtor.

### iii.    Green Hills Is Likely to Succeed on the Merits.

61.    The third factor in assessing the propriety of lifting the automatic stay is whether

the movant has some probability of success on the merits.  The required showing for this factor is

"very slight."  *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. 538, 549 (Bankr. D. Del. 2016).  "Even

a slight probability of success on the merits may be sufficient to support lifting an automatic stay

in an appropriate case."  *Am. Airlines*, 152 B.R. at 426; *see also Levitz Furniture Inc. v. T. Rowe

Price Recovery Fund, L.P. (In re Levitz Furniture Inc.)*, 267 B.R. 516, 523 (Bankr. D. Del. 2000)

("Defendants have met the third prong, since that merely requires a showing that their claim is not

frivolous.").

62.    Here, but for the automatic stay, Green Hills would have succeeded in its efforts to

exercise its rights and remedies under the Loan Agreement, including by foreclosing on its

Collateral in accordance with the UCC.  Before the Petition Date, the Debtor acknowledged it was

in default under the Loan Agreement and never questioned Green Hills' right to enforce its rights

and remedies under applicable law.  Further, in all aspects, Green Hills conducted a sale process

that was "commercially reasonable."  This included retaining an auctioneer to conduct the auction,

and publishing notice of the sale in five different publications, both nationally and internationally,

in print and online.  If the Court lifts the automatic stay, Green Hills will continue the process it

began before the bankruptcy filing and successfully complete a foreclosure sale pursuant to the

UCC and applicable law.

### iv.     Granting Relief from Stay Can Provide Societal Benefit.

63.     Finally, although not the typical result with respect to a request for relief from stay, granting the relief requested herein also has the potential to provide societal benefit.  Prior to the Petition Date, the Debtor and Green Hills had discussed providing a batch of the international-band Phones to the government in Ukraine to assist in its efforts against the invasion by Russia. In fact, it appeared that all governmental clearances had been obtained for this to occur.  However, the inability to reach consensus on deal terms, and now the commencement of this chapter 11 case, has stalled and now stayed the ability to implement this plan.  The Debtor, without employees or present operations, cannot provide functioning secure Phones to any party, let alone provide any back-end network support for these Phones.  Green Hills, however, can provide the Phones and back-end network support to Ukraine right now, and without further delay.  Accordingly, to the extent this plan can be implemented notwithstanding the Debtor's delay, granting the relief requested in this Motion has the potential to benefit a country in need while the Debtor continues to figure out whether it even has a path forward.

### C.     The Debtor Has No Equity in the Collateral, and the Collateral Is Not Necessary to an Effective Reorganization.

64.     Relief from stay is also warranted because the Debtor "does not have an equity in" Green Hills' Collateral, and the Collateral "is not necessary to an effective reorganization."  *See* U.S.C. § 362(d)(2).  To determine whether a debtor has equity in property for purposes of section 362(d)(2), a court should compare the total liens against the property with the property's current value.  *Nantucket Invs. II v. Cal. Fed. Bank (In re Indian Palms Assocs., Ltd.)*, 61 F.3d 197, 206 (3d Cir. 1995).  As discussed above, based on the current record, Green Hills' secured claim, which is secured by a lien on the Phones and other Collateral, far exceeds any interest of the Debtor in the Collateral.  And the value of the Phones is depreciating on a daily basis as their battery capacity

diminishes with time, and they become more obsolete as mobile technology and network standards continue to evolve. Accordingly, as the total liens against the Phones far exceed the Phones' value, the Debtor has no "equity" in the Collateral.

65.    "If a creditor has shown that the debtor does not have equity in the property at issue, the debtor bears the burden of showing the property is necessary to an effective reorganization to avoid a lift of the automatic stay." *Baratt v. Hudson City Savings Bank (In re Baratt)*, 2014 WL 3900871, at *2 (D.N.J. Aug. 11, 2014) (citing *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988)). For a debtor to meet this burden, it must establish that there is "a reasonable possibility of a successful reorganization within a reasonable time" and that the property is necessary to such reorganization. *Timbers*, 484 U.S. at 375–76. Here, the Debtor cannot meet that burden. The Debtor has no viable business going forward and has utterly failed to articulate prospect for its reorganization, let alone that reorganization would occur within a reasonable time. Accordingly, the Court should grant relief from stay under section 362(d)(2) to allow Green Hills to exercise its rights and remedies with respect to its Collateral, including by proceeding with the foreclosure process that began before the Petition Date.

## **WAIVER OF BANKRUPTCY RULE 4001(a)(3)**

66.    Bankruptcy Rule 4001(a)(3) provides that "[a]n order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 4001(a)(3).

67.    It is clear that the Debtor cannot assume the License Agreement without Green Hills' consent, and the Debtor has no viable business for which the Collateral can be put to use. Accordingly, Green Hills respectfully requests that this Court grant the requested relief effective immediately, so that Green Hills can realize the benefit of its bargain and end the continuous and

ongoing breach of its License Agreement, which if permitted to continue, risks reputational harm and damage to Green Hills' brand.

## RESERVATION OF RIGHTS

68.     Green Hills expressly reserves all of its rights with respect to this Motion, including the right to amend or supplement this Motion at any time prior to the final hearing thereon.

## NOTICE

69.     Green Hills will serve notice of this Motion on: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Debtor; (iii) The Roundtable LLC Series 30; (iv) Hector T. Hoyos; (v) the top 20 unsecured creditors; and (vi) all parties entitled to receive notice pursuant to Bankruptcy Rule 2002.   Green Hills submits that, under the circumstances, no other or further notice is required.

## NO PRIOR REQUEST

70.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, Green Hills respectfully requests that the Court enter the Proposed Order (i) granting relief from the automatic stay to allow Green Hills to (a) terminate the License Agreement; and (b) exercise its rights and remedies with respect to the Collateral securing its claims against the Debtor; (ii) waiving the 14-day stay provided for in Bankruptcy Rule 4001(a)(3); and (iii) granting such other and further relief as the Court deems just and proper.

[*Remainder of page intentionally left blank*]

Dated: May 10, 2022
      Wilmington, Delaware

Respectfully Submitted,

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**

*/s/ Elizabeth S. Justison*
Sean M. Beach (No. 4070)
Elizabeth S. Justison (No. 5911)
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:    sbeach@ycst.com
            ejustison@ycst.com

– and –

**GIBSON, DUNN & CRUTCHER LLP**
Candice Choh (*pro hac vice* pending)
Michael S. Neumeister (*pro hac vice* pending)
Michael G. Farag (*pro hac vice* pending)
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email:    cchoh@gibsondunn.com
            mneumeister@gibsondunn.com
            mfarag@gibsondunn.com

Matthew S. Kahn (*pro hac vice* pending)
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Telephone: (415) 393-8200
Facsimile: (415) 393-8306
Email:    mkahn@gibsondunn.com

*Counsel to Green Hills Software LLC*